IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

KENNETH W. YATES,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )        CIVIL ACTION NO. 09-00212-CG-N
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security      )
                                     )
        Defendant.                   )

REPORT AND RECOMMENDATION

Plaintiff Kenneth W. Yates filed this action seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner") that he was not

entitled to disability insurance benefits or supplemental security income under Titles II

and XVI of the Social Security Act (the Act).  This action has been referred to the

undersigned for entry of a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).  A hearing was held on November 17, 2009 before the undersigned

Magistrate Judge.  Present at the hearing were Colin E. Kemmerly, Esq., counsel for the

plaintiff and AUSA Alex Langford, counsel for defendant.  Upon consideration of the

arguments of counsel, the administrative record (doc. 14) and the parties' respective

briefs (docs. 15, 16), it is hereby **RECOMMENDED** that the decision of the

Commissioner be **VACATED and REMANDED**.

I.      Procedural History.

        Plaintiff filed an application for disability insurance benefits and supplemental

security income on June 18, 2004, claiming an onset of disability as of November 30,

2002. (Tr. 83, 248). His applications were denied on August 27, 2004. (Tr. 61-65).

Plaintiff requested a hearing on October 14, 2004. (Tr. 66). Following an administrative

hearing on April 17, 2007 (Tr. 279-313)[1], the Administrative Law Judge ("ALJ") issued

an unfavorable decision on May 14, 2007 (Tr. 21-31) in which he found that Plaintiff

retained the residual functional capacity ("RFC") to perform unskilled light work with

several nonexertional limitations, and that he was not disabled within the meaning of the

Act. Plaintiff requested review by the Appeals Council on May 31, 2007 (Tr. 16-17),

which was denied on April 1, 2009 (Tr. 6-10), thereby making the ALJ's decision the

final decision of the Commissioner. *See* 20 C.F.R. § 404.981 (2009).[2]

II.   Issue on Appeal.

　　　Plaintiff alleges as his sole grounds for appeal that the ALJ erred by failing to

determine that his impairments met Listing 12.05C.[3]

---

[1]Hearings conducted on April 28, 2006 (Tr. 268-71) and November 29, 2006, (Tr. 274-278) were continued to allow the claimant to undergo psychological testing

[2]  All references to the Code of Federal Regulations (C.F.R.) are to the 2009 edition.

[3] Listing 12.05 "contains an introductory paragraph with the diagnostic description for mental retardation.". The impairment must satisfy the diagnostic description in the introductory paragraph and any one of the four sets of criteria described in section 12.05 to meet the listing requirements. Id.  Listing 12.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.00(A). "To be considered for disability benefits under section 12.05, a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; and (3) have manifested deficits in adaptive behavior before age 22." Crayton v. Callahan, 120 F.3d 1217, 1219 (11th Cir.1997).

Listing 12.05(C) requires "[a] valid verbal, performance, or full scale I.Q. of 60 through 70 and a

2

III.     Findings of Fact and Conclusions of Law.

    A.     Background and Relevant Evidence.

Plaintiff was born on November 29, 1964.  (Tr. 83).  He was 43 years of age at the time of the administrative hearing on April 17, 2007.  *Id.*  Plaintiff left school after repeating the ninth grade three years without passing[4] and worked in the relevant past only as a lumber stacker and janitor.  (Tr. 150, 286, 288-294, 303).   Plaintiff's high school records reflect special education classes.[5]

Plaintiff's pay records reflect that he worked on and off from 1980 through 2003. (Tr. 89-91).  The Commissioner concedes that "[n]ot all of Plaintiff's work was at the substantial gainful activity level."  (Commissioner's Brief (Doc. 16) at n. 2).  The evidence of record actually reflects that Plaintiff earned nothing in 1982, 1983, 1985 and 1987 and, with the exception of 2002, he never earned more than $10,000.00 during any

---

physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 12.05(C).  To meet 12.05(C), the applicant must have a severe impairment that significantly limits the applicant's "physical or mental ability to do basic work activities." Id. at § 12.00(A). "Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities." Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir.1992).

    [4]The record also reflects that plaintiff repeated the Fifth Grade twice.  (TR. 146)

    [5] The ALJ noted that in the ninth grade plaintiff had been placed in "EMR" classes and that subsequent school records reflected that plaintiff was also placed in "SLD" classes.  The ALJ did not define these acronyms in his order.  However, the court takes judicial notice that the acronym "EMR" stands for "Educable Mentally Retarded" and the acronym SLD stands for Specific Learning Disability.

year and often much less.[6]

On July 31, 2006, Plaintiff underwent a psychological evaluation by John Davis, Ph.D. at the request of the agency (Tr. 220-25).  Plaintiff reported that he lived with his elderly mother, helped around the house, and watched television.  Dr. Davis administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) and a Wide Range Achievement Test-Revision 3 (WRAT-3).  On the WAIS-III, Plaintiff obtained a verbal IQ score of 65, performance scale IQ of 55, and a full scale IQ score of 57, indicating a functioning within the mild mentally retarded range (Tr. 224).  On the WART-3, Plaintiff scored at the first grade level for reading and arithmetic, and at the kindergarten level in spelling (Tr. 224).  Dr. Davis, however, did not believe that Plaintiff's test scores were valid and thought that Plaintiff's test results were an underestimation of his actual abilities (Tr. 223-25).

During December 2006, Plaintiff underwent a psychological evaluation by Michael Rosenbaum, Ph.D. at the request of plaintiff's attorney (Tr. 234-41).   On the WAIS-III performed by Dr. Rosenbaum, Plaintiff obtained a verbal IQ score of 66, performance scale IQ of 76, and a full scale IQ score of 68, indicating an extremely low range of intellectual functioning (Tr. 236-37). On the WART-3, Plaintiff scored at the

_____

[6]The record indicates that Plaintiff's only earnings were: $719.20 in 1980;  $1,133.35 in 1981;  $164.67 in 1984; $402.00 in 1986; $1,727.50 in 1988; $2,454.06 in 1989;  $ 415.00 in 1990; $2,052.60 in 1991; $617.76 in 1992; $4,446.34 in 1993;  $5,941.69 in 1994;  $9,297.7 in 1995;  $5,124.75 in 1996;  $9,540.90 in 1997;  $7,976.41 in 1998;  $3,299.98 in 1999; $4,306.10 in 2000;  $8,409.15 in 2001;  $14,874.98 in 2002; and  $3,270.00 in 2003.  (Tr. 86).

first grade level for reading and spelling and at the second grade level for arithmetic (Tr. 237).  Dr. Rosenbaum believed that Plaintiff's test results were valid. (Tr. 236-237).  Dr. Rosenbaum also believed that Plaintiff met the criteria for functional illiteracy (Tr. 236-38) and diagnosed Plaintiff with mild mental retardation. (Tr. 240).

At the administrative hearing conducted on April 17, 2007, Plaintiff testified that he had a driver's license at one time when he was younger which he obtained after passing the required test "with some help" on the first attempt[7], that he could count money[8], and that he paid his mother's bills (Tr. 285, 287)[9].  He also testified that he tries to cook for his mother, tries to clean the little two-bedroom house he has lived in for six years with his mother and, although his mother does her own laundry, he does his own laundry (Tr. 295-96).

B.      Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one.  Specifically, the Court's review is limited to determining: 1) whether the decision is supported by substantial evidence, and 2) whether the correct legal standards were

---

[7]  Plaintiff was unable to pinpoint the specific date he held a driver's license and could only recall that it had "expired" at some point.  Plaintiff testified that he took an oral test and passed it with "some help" from his sister.  Plaintiff further testified that at a later date he unsuccessfully tried to pass the test to obtain a job at the Prichard Housing Authority.  (Tr. 291).

[8]  Plaintiff testified that he could count money "pretty good" but also stated that he typically "gets fired when it comes to checking inventory."  (Tr. 287).  In fact, plaintiff testified that most of his work was janitorial in nature.

[9]  Plaintiff testified that his mother gave him the money and he paid the bills for her. (Tr. 287).

applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir.1990).  Thus, a court may not

decide the facts anew, reweigh the evidence, or substitute its judgment for that of the

Commissioner.   <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir.1986).  Rather, the

Commissioner's findings of fact must be affirmed if they are based upon substantial

evidence.  <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir.1991); <u>Bloodsworth v.</u>

<u>Heckler</u>, 703 F.2d 1233, 1239 (11th Cir.1983) (finding that substantial evidence is

defined as "more than a scintilla but less than a preponderance," and consists of "such

relevant evidence as a reasonable person would accept as adequate to support a

conclusion[ ]"). In determining whether substantial evidence exists, a court must view the

record as a whole, taking into account evidence favorable as well as unfavorable to the

Commissioner's decision. <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir.1986).

     C.     <u>General Statement of the Law</u>

     An individual who applies for Social Security disability benefits or supplemental

security income must prove their disability.  *See* 20 C.F.R. § 404.1512; 20 C.F.R. §

416.912.  Disability is defined as the "inability to do any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than twelve months."   42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §

404.1505(a); 20 C.F.R. § 416.905(a).   The Social Security regulations provide a five-step

sequential evaluation process for determining if a claimant has proven their disability.

See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  At the first step, the claimant must prove

6

that he or she has not engaged in substantial gainful activity.  At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments.  If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience.  If, however,  the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work.  Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).  In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history.  Id. at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity[10] and age, education, and work history.  Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th  Cir. 1999); see also  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564

---

[10]  Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite his impairments. 20 C.F.R. § 404.1545(a).

(11th Cir. 1985)).

    D.    <u>ALJ's Findings and Conclusions.</u>

The ALJ, as a preliminary matter, found that the Plaintiff met the insured status requirements of the Social Security Act through September 30, 2008 based on his earning records (Tr. 21, 23).  Plaintiff was advised that he "must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits." (Tr. 21).

At the first stage of the evaluation process[11], the ALJ found that the plaintiff had not engaged in substantial gainful activity since November 30, 2002, the alleged onset date (Tr. 23).  The ALJ concluded that plaintiff's disability could not be based on work activity alone because Plaintiff's work activity from July 1, 2003 through October 15, 2003[12] merely "represented an unsuccessful work attempt as it lasted just over three months after a significant break from work activity" (*Id.*).

The ALJ then found, at the second stage, that plaintiff "had the following severe impairments: history of migraine headaches, status post fracture of the right patella and open reduction and internal fixation repair, arthritis of the right knee and patellofemeral

---

[11] The Commissioner analyzes a disability claim employing the following five sequential steps: "(1) is the individual performing gainful activity; (2) does he have a serious impairment; (3) does he have a serious impairment that meets or equals an impairment specifically listed in 20 C.F.R. part 404, subpart P, appendix 1; (4) can he perform his past relevant work; and (5) based on his age, education, and work experience can he perform work of the sort found in the national economy." <u>Bouie v. Astrue</u>, 226 Fed. Appx. 892, 894 (11th Cir.2007) (citation, brackets and quotation marks omitted).

[12]The record reflects that plaintiff "earned $896.00 in July of 2003, $896.00 in August of 2003, $896.00 in September of 2003, and $582.00 in October of 2003" (Tr.23).

joint, history of lumbaosacral strain, hypertension, degenerative joint disease and borderline intellectual functioning" (Tr. 23-24).  However, the ALJ further found as follows:

> [T]he claimant has had relatively conservative treatment for his allegedly disabling medically determinable impairments.  He had surgery on his right knee in 2000; however, subsequent to same did not participate in therapy and was judged capable of returning to work.  Treatment records reflect that on several occasions, the claimant has gone for up to two years without treatment for any of his allegedly disabling medical conditions.  This is despite the fact that he has received free or reduced cost medical care.  He has not sought emergency treatment for any alleged impairment herein, and has not been hospitalized during the relevant period of disability considered herein.  It is reasonable to assume that an individual would seek medical attention, especially free medical attention, if his impairments were as severe or disabling as alleged in this application for benefits. [T]he claimant's medical impairments have been well controlled with little or no medical treatment.

(Tr. 25).

At the third stage of evaluation, the ALJ concluded that the Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1526, 416.920(d), 416.925 and 416.926)" (Tr. 25). In reaching this decision, the ALJ specifically discounted  Dr. Rosenbaum's opinion that Plaintiff met Listing 12.05 not only because "[t]he decision as to whether an individual is disabled or meets a listing is one reserved for the Commissioner," but because "Dr. Rosenbaum's conclusion that the claimant exhibited significant subaverage functioning prior to age 22 is not supported by the record." (Tr. 26).  It is the second reason given by the ALJ for discounting Dr.

9

Rosenbaum's opinion that is challenged by the plaintiff and most affects the outcome of this case. The ALJ criticized Dr. Rosenbaum's opinion because:

> There are no records reflecting that the claimant achieved test scores, which would indicate that he functioned in the mental retardation range. School records have reflected that in the ninth grade he had been placed in "EMR" classes, however, the complete school record, which included objective test results, was not provided to reflect his assessed level of functioning (Exhibit 13E). In addition, subsequent school records indicated that he was placed in "SLD" classes. Absent more proof, the undersigned cannot conclude that the claimant had significant subaverage general intellectual functioning.

(Tr. 26).

At the fourth step of the evaluation process, the ALJ found that the plaintiff "has the residual functional capacity to perform unskilled work and sit for up to eight hours; stand for six hours; walk for four hours; occasionally lift up to twenty-six pounds; occasionally carry up to twenty-five pounds; use his hands for simple grasping, pushing or pulling of controls and fine manipulation; use his feet for pushing and pulling of controls; occasionally bend, squat, crawl and climb; drive automotive equipment; be exposed to dust or fumes with moderate restrictions as to being around moving machinery and total restriction from working around unprotected heights." (Tr. 27).

At the fifth stage in the process, the ALJ concluded that Plaintiff "is unable to perform any past relevant work," (Tr. 29). The ALJ explained that, pursuant to the vocational expert's testimony, Plaintiff's past relevant work was classified as "medium and unskilled" and "performed at an exertional level which currently exceeds the claimant's residual functional capacity as set forth herein." (*Id.*) The ALJ relied

10

principally on Dr. William Crotwell's report and Physical Capacities Evaluation of the Plaintiff. (Tr. 27-28).

At the final step of the process, the ALJ held that, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 30). The ALJ relied upon the vocational expert's testimony, which was based upon the residual functional capacity set forth above as found by the ALJ at the fourth step of the evaluation process, as well as the evidence that Plaintiff, having been born on November 29, 1964, was 37 years old on the alleged disability onset date; that Plaintiff is illiterate with a Full Scale IQ of 68 and the ability to communicate in English; and that the transferability of job skills is not an issue because Plaintiff's past relevant work was unskilled. (Tr. 30).

      E.    <u>Analysis</u>.

1.    **The ALJ improperly determined that Plaintiff did not meet or equal Listing 12.05C.**

Plaintiff contends that the ALJ committed reversible error by failing to find that "Plaintiff's impairments meet, equal, or medically equal Listing 12.05(c)." (Plaintiff's Brief (Doc. 15) at 2, 3, and 7). *See* <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994)("[T]he agency's interpretation must be given " 'controlling weight unless it is plainly erroneous or inconsistent with the regulation'.").

The agency has interpreted Listing 12.05(c) to include three prongs: (1) mental

retardation, i.e., significantly subaverage general intellectual functioning with deficits in

adaptive behavior, initially manifested during the developmental period; (2) a valid

verbal, performance, or full scale intelligence quotient (IQ) score in the range specified

by Listing 12.05(c); and (3) a physical or other mental impairment that imposes an

additional and significant work-related limitation of function.  In order to meet Listing

12.05(c), a claimant must meet all three prongs.  *See* Sullivan v. Zebley, 493 U.S. 521,

530 (1990)("For a claimant to show that his impairment matches a listing, it must meet all

of the specified medical criteria. An impairment that manifests only some of those

criteria, no matter how severely, does not qualify."); 20 C.F.R. § 404.1525 ("To meet the

requirements of a listing, you must have a medically determinable impairment(s) that

satisfies all of the criteria in the listing.").

Plaintiff argues, and the undersigned agrees, that two of these prongs were

satisfied according to the ALJ, himself.  As to one prong, the ALJ specifically found that

plaintiff had several "severe impairments," including "history of migraine headaches, . .

.arthritis of the right knee and patellofemeral joint, history of lumbaosacral strain,

hypertension, degenerative joint disease and borderline intellectual functioning."  (Tr. 23-

24).  In addition, although the ALJ did not give Dr. Rosenbaum's opinion "significant

weight" with respect to his "findings as to the claimant having Major Depressive Disorder

and Generalized Anxiety Disorder," he did not question the validity of the test results Dr.

Rosenbaum reported regarding plaintiff's "Full Scale IQ score of 68, Performance IQ of

76  and verbal IQ 66," even to the extent there was a chance that the "'true' Full Scale IQ

fell in the range between 65 (extremely low) and 72 (borderline)."  (Tr. 26).  The record itself contains no evidence to refute the validity of these test results, certainly no substantial evidence.  The ALJ thus essentially concluded that Plaintiff satisfied a second prong.

The only prong that the ALJ held was not satisfied was the requirement that Plaintiff's mental retardation "initially manifested during the developmental period."  The ALJ specifically concluded that "Dr. Rosenbaum's conclusion that the claimant exhibited significant subaverage functioning prior to age 22 is not supported by the record."  (Tr. 26).

As stated above, the capsule definition of Listing 12.05(c) requires that a claimant demonstrate significantly subaverage intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., prior to age 22. The degree of deficits in adaptive functioning needed to meet the requirements of Listing 12.05(c) is not specified in the statute. A quantitative definition of adaptive functioning is, however, found in the *Diagnostic and Statistical Manual of Mental Disorders* 49 (4th ed. Text Rev. 2000)(DSM-IV). The DSM-IV provides:

> The diagnostic criteria for mental retardation include "[c]oncurrent deficits or impairments in present adaptive functioning . . . **in at least two of the following areas**: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (emphasis added).[13]

---

[13]The Social Security Agency noted that the definition of Mental Retardation used in the listings is consistent with the definitions of Mental Retardation used by the leading professional

As applied to this case, the ALJ found that Plaintiff's full scale IQ score was 68, which only partially satisfied part C of Listing 12.05.  According to the ALJ, the only evidence to support the contention that Plaintiff's subaverage intellectual functioning was accompanied by deficits in adaptive functioning prior to age 22 was Dr. Rosenbaum's conclusions which the ALJ discounted.  As stated previously, the ALJ concluded that the evidence of record on this point was insufficient:

> There are no records reflecting that the claimant achieved test scores, which would indicate that he functioned in the mental retardation range.  School records have reflected that in the ninth grade he had been placed in "EMR" classes, however, the complete school record, which included objective test results, was not provided to reflect his assessed level of functioning (Exhibit 13E).  In addition, subsequent school records indicated that he was placed in "SLD" classes.  Absent more proof, the undersigned cannot conclude that the claimant had significant subaverage general intellectual functioning.

(Tr. 26).   The ALJ appeared to reach his conclusion based solely on the Plaintiff's pay records which reflected that he worked off and on from 1980 through 2003.  (Tr. 89-91).  However, as stated previously, the Commissioner concedes that "[n]ot all of Plaintiff's work was at the substantial gainful activity level."  Defendant's Brief (Doc. 16) at n. 2.  The evidence of record further reflects that the only work Plaintiff ever did was "either stacking the lumber [] or doing janitor work" (Tr. 294), which he testified he could no longer do because of his knee and back problems (Tr. 290, 293).   The record also reflects that Plaintiff was fired from his jobs when he, because of his illiteracy, could not "check[]

---

organizations.  Technical Revisions to Medical Criteria for Determinations of Disability, 67 FR 20018, 20022 (April 24, 2002).

inventory and stuff like that." (Tr. 287).

It was error for the ALJ to find that plaintiff failed to submit sufficient evidence of the mental impairment prior to age 22.  The Eleventh Circuit has held that when a plaintiff presents a valid I.Q. score in the range prescribed by Listing 12.05, then that plaintiff creates a rebuttable presumption that the impairment is lifelong and existed during the developmental period.  Hodges v. Barnhart, 276 F.3d 1265, 1269 (11th Cir.2001).  There is simply no indication that the ALJ employed the Hodges presumption.  In addition, the ALJ appears to have ignored other evidence in the record of mental impairment prior to age 22, including evidence that plaintiff had been placed in special education classes, repeated the fifth grade twice before passing to the sixth grade and repeated the ninth grade three times without passing.

The ALJ found that the plaintiff is illiterate (Tr. 30) and, although Plaintiff testified that he did pass a driver's license test at one time, he also testified that his sister helped him prepare and he had to have the test read to him the first time (Tr. 285) but was unable to pass a second test required later because his license expired (Tr. 291).   There is no evidence in this record that Plaintiff ever suffered any sort of injury or disease that would have altered his intellectual or mental abilities from their status prior to age 22. The rebuttable presumption in Hodges controls "absent evidence of sudden trauma that can cause retardation." 276 F.3d at 1268.

The Eleventh Circuit remanded the case in Hodges  because "[t]he ALJ . . . did not recognize the presumption that the claimant had initially met her burden of establishing

15

an impairment under Listing 12.05(c) [by presenting a valid IQ score of 60 - 70 and evidence of additional mental or physical impairment].  *Id.*   Such similarly occurred in the case at bar when the ALJ acknowledged that the Plaintiff "is illiterate" and had "subaverage general intellectual functioning" which was a severe impairment, but did not find that his subaverage intellectual functioning was accompanied by deficits in adaptive functioning prior to age 22 because there was no evidence in the record of intelligence testing during the Plaintiff's developmental years and despite the evidence that, even while attending special education classes, he had to repeat fifth grade twice and then repeated ninth grade three times without passing.  Consequently, this case must be remanded with to allow the ALJ to properly apply the <u>Hodges</u> presumption.

In <u>Grant v. Astrue</u>, 255 Fed.Appx. 374 (11th Cir. 2007), the Eleventh Circuit affirmed the district court's reversal of the ALJ's adverse determination under a similar fact pattern:

> In this case, the ALJ found, and the Commissioner does not dispute, that Grant had a valid IQ score of 69 and that she possessed a physical or mental impairment imposing an additional and significant work-related limitation of function. She was therefore entitled to the benefit of the rebuttable presumption established in <u>Hodges,</u> and the ALJ was charged with determining whether there was sufficient evidence to rebut that presumption. **The ALJ applied an improper legal standard, however, by requiring her to demonstrate deficits in more than one area of adaptive functioning before the age of 22.** This was error because Grant was entitled to the benefit of the presumption. Despite erroneously placing the burden of proof on her, the ALJ nonetheless devoted one sentence in his decision to finding the presumption rebutted, but did not account for his decision's internal inconsistencies or support this finding with any facts or reasoning.

In sum, the ALJ applied improper legal standards in finding that Grant did not meet the criteria for the mental retardation Impairment Listing in § 12.05C. We therefore vacate the judgment of the district court, with the instruction that the court remand the case for a determination of whether there was sufficient evidence to rebut the presumption that Grant manifested deficits in adaptive functioning before the age of 22.

Id. at * 1-2 (emphasis added).  In stark contrast is the case of Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007) in which the Court upheld the ALJ's denial of benefits on the grounds that

> [The Plaintiff] lives on her own, taking care of three children . . . without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction. Her intellectual limitations pose serious challenges to her ability to raise a family on her own. But she has overcome those challenges well enough that she should be able to hold down a full-time job.

Novy v. Astrue, 497 F.3d 708, 710 (7th Cir. 2007).  There is no evidence in the case at bar that Plaintiff had any skills comparable to a mother raising three children from infancy while simultaneously holding down a full-time job without any assistance. At best, the record here indicates that the Plaintiff could pay his mother's bills when she handed him the money with which to make a given payment, could do his laundry and could do some cooking.  Although his mother was 87,  the record does not indicate to what extent the Plaintiff was ever required to provide any physical care for his mother.[14]

---

[14]Plaintiff testified that the only help he gave his mother in paying bills was to go and pay a given bill when his mother gave him the money and instructed him to pay it. (Tr. 287).  There is no evidence that the Plaintiff was ever otherwise responsible for seeing that any household bill was paid.  Plaintiff also testified that his mother does her own laundry,  "can get around" and likes to do the grocery shopping herself.  (Tr. 296).

Finally, the undersigned concludes that the cases relied upon by the Commissioner are clearly distinguishable with regard to the evidence relied upon by the ALJ to conclude that claimant's daily activities rebuts the presumption of disability under Listing 12.05C. *See e.g.* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992)(held that "substantial evidence does not support the ALJ's finding that Lowery's mental retardation did not manifest itself before age twenty-two."[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior."); Popp v. Heckler, 779 F.2d 1497, 1499-1500 (11th Cir. 1986)(similarly held that the Commissioner is not required to make a finding of mental retardation on IQ scores alone when test results were inconsistent with claimant's activities and behavior). [15] *See also* Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)(claimant not disabled by mental impairment where he successfully held employment for many years with the cognitive abilities he currently possessed, demonstrated he was capable of receiving and applying job skill training, cared for his family by performing household chores and paying all the bills, played games such as dominoes and cards with his friends, and capable of following the instructions necessary for making a cake); Williams v. Sullivan, 970 F.2d 1178, 1186 (3rd Cir. 1992)(despite claimant's IQ score of 66, the fact that he worked for twenty-two years at a steel drum

---

[15] In Popp, the court upheld the rejection of a claim of equivalency to Listing 12.05C on the grounds that the claimant's I.Q. score of 69 was "inconsistent with evidence that [the claimant] had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher." 779 F.2d at 1499.

factory refuted his claim of deficient intellectual functioning before age 22); Callahan v. Astrue, 2008 WL 4999100, * 4 (M.D. Ala. Nov. 20, 2008)(rejected claimant's contention that, based solely on her history of special education classes while in school to the tenth grade, the ALJ failed to properly develop the record with IQ testing and held that "the ALJ was entitled to consider a claimant's activities and work history when the claimant argues disability due to lower-range intellectual functioning" but has presented no evidence herself of IQ test results indicating any level of mental retardation). *See also* Whetstone v. Barnhart, 263 F.Supp.2d 1318, 1325 (M.D. Ala. 2003)(ALJ properly discounted claimant's present IQ score not only because her school records show no evidence of special education placement but the ability in the 7th grade to make an A- in English and a B in Math and the ability in the 8th grade to make B's in English and Social Studies but because raised one child to maturity, worked for the same company for 16 or 17 years as a sewing machine operator, and her daily activities included driving, shopping, reading the bible, handling bills, cooking, and doing laundry);   House v. Apfel, 2000 WL 1368012, *8 (S.D. Ala. Sept. 6, 2000) (claimant's test scores were not supported by the evidence where claimant had completed the eighth grade, worked the same job as a creeler operator[16] in a carpet plant for 20 years, has a driver's license,

---

[16]The Court in House defined plaintiff's job in the carpet plant as follows:

> The Dictionary of Occupational Titles defines a "creeler" as one who "creels looms, twisters, warpers, tufting, or other textile machines to change style of yarn or to replace exhausted yarn packages: Places yarn packages on spindle of creel, according to supervisor's instructions, color-coded spools, or number on yarn packages. Threads yarn through

cleaned the house, washed clothes, cooked every night, watches television, and visited

with friends).

IV.    Conclusion.

For the reasons stated above, it is hereby **RECOMMENDED** that the decision of

the Commissioner of Social Security denying plaintiff's benefits be **VACATED AND**

**REMANDED**.

The attached sheet contains important information regarding objections to this

Report and Recommendation.

**Done** this 10th day of December, 2009.

/s/ Katherine P. Nelson
**UNITED STATES MAGISTRATE JUDGE**

---

eyelet play (yarn guides) or ties yarn ends to ends of yarn from preceding package to maintain continuous yarn supply. Cuts yarn ends from knots, using scissors, and discards yarn ends in waste container to prevent entanglement of yarn while moving through creel. Removes old yarn from machines before changing to different size of type of yarn. Cleans dust and lint from creel. May repair yarn breaks in creel. May replace yarn packages or spools when faulty yarn appears." DOT. 689.687-030. (1991 ed.) Creel is defined as "a bar with skewers for holding bobbins in a spinning machine. Merriam Webster's Collegiate Dictionary (10th Ed.1993).

2000 WL 1368012 at n. 1.

MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within fourteen days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within fourteen days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

        **Done** this 10th day of December, 2009.

                                        /s/ Katherine P. Nelson
                                        UNITED STATES MAGISTRATE JUDGE